**SPECIALTIES DEVELOPMENT CORPORATION**

v.

**UNITED STATES.**

No. 80–53.

United States Court of Claims.

March 5, 1958.

Floyd H. Crews, New York City, for plaintiff. Harvey W. Mortimer, Darby & Darby, New York City, and J. William Carson, Belleville, N. J., were on the briefs.

Carl D. McManamy, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

WHITAKER, *Judge.*

Plaintiff sues for reasonable and entire compensation for the unauthorized use of its patent by the United States. Plaintiff is the assignee of Daniel Mapes, patentee under United States Patent No. 2,521,526 issued September 30, 1950.

The only issue now before us is the validity of plaintiff's patent. If it is valid, there can be no doubt that defendant infringed it.

Plaintiff's patent is on a charge for a carbon dioxide container, such as a fire extinguisher, for use in extremely cold temperatures, and on methods for filling the container with the charge.

The ordinary fire extinguisher of this type is filled with carbon dioxide that has been subjected to sufficient pressure to liquefy it. It works satisfactorily at temperatures between zero and 140° Fahrenheit. At below zero temperatures the passage between the valve at the top of the container and the orifice, through which the liquid carbon dioxide escapes into the outside air, tends to become clogged with solid carbon dioxide, and, in addition, the pressure of the carbon dioxide in the container is greatly decreased. The clogging and the decreased pressure result in an unsatisfactory discharge, or none at all.

Plaintiff's patent is designed to remedy the condition which exists at these extremely low temperatures. It accomplishes this by the removal of some of the carbon dioxide and the injection of sufficient nitrogen, or any other gas that is chemically inactive with carbon dioxide, and which has a critical temperature of —80.5° F. or less, to bring up the pressure in the container to at least 200 pounds per square inch at—60° F. It found that this prevented clogging in the outlet passage and produced a steady, uninterrupted flow of the carbon dioxide.

1. Defendant says that such a charge is not patentable because the result accomplished was no more than could be expected by the application of well known laws relating to gases.

This position is contrary to the testimony of the experts, both for the plaintiff and for the defendant. They both say that the normal expectation from an increase in the pressure within the chamber at these sub-normal temperatures would be more solid carbon dioxide, or dry ice, or snow, as it is often called, in the passageway, and, hence, more clogging. This is because the cooling effect, incident to the release of the liquid from the pressure within the chamber, is increased as the pressure in the chamber is increased. Therefore, when the liquid carbon dioxide in the chamber is very cold, the additional cooling due to the escape from higher pressures would, according to known laws, tend to create more solid carbon dioxide and, hence, more clogging; the greater the pressure within the chamber the greater the cooling effect on escape.

■ But, for some reason, as yet not clearly known, the increase in the pressure in the chamber by the use of an inert gas tends to eliminate solidification of the carbon dioxide in the outlet passage. Plaintiff does not know exactly why, its experts do not, nor do defendant's. But it works. Plaintiff is not required to show precisely why it does.

Plaintiff's invention was, therefore, novel, and is patentable.

John H. Cantlin, an officer in the United States Army, made the same discovery that Mapes, the patentee, had made earlier. He filed an application for patent on it some eleven months after the Mapes' application was filed. His application was prosecuted by the United States Army Air Force. Cantlin described his invention as follows:

"Pursuant to the present invention, the carbon dioxide container or system is supercharged with dry nitrogen gas, preferably under sufficient pressure to insure proper functioning of the apparatus at all temperatures between approximately –70° F. and +160° F."

Army Air Force counsel argued in favor of the allowance of Cantlin's claims as follows:

"Applicant's invention having been fully accepted and put to use in answer to a heretofore unsolved difficulty there would seem to be no room for doubt as to the operativeness of the invention. The invention has been adopted by the U. S. Army Air Force as shown by the Technical Order. The observance of such Orders is mandatory in the Air Forces and the promulgation thereof is based on general acceptance of the improvement by

means of extensive service tests, not on a mere suggestion by some one individual, nor on the basis of a few successful experiments."

Interference proceedings were instituted between the Mapes and Cantlin applications. When Mapes showed that he had made the discovery some three years before Cantlin, Cantlin withdrew, the interference proceedings were dissolved, and the patent was issued to Mapes.

All this time at the instance of defendant, the Massachusetts Institute of Technology and various others had been trying to find a solution to the problem. Mapes solved it. Whether fortuitously or by supernatural divination, he nevertheless solved it.

■ 2. Next, defendant says, the claims are lacking in criticality. We suppose defendant means by this they are not definite enough. It seems to us they are as definite as they could be in order to apply them to the varying situations that could be expected to arise. If the extinguisher was intended for use in an airplane, where the ground temperature was 140° F. and the temperature at the height to which the airplane was expected to ascend was −60° F., you could use only enough nitrogen to exert a pressure of 200 pounds per square inch at −60° F., because if you had a higher pressure, the container might explode when the airplane returned to the 140° temperature. But this would not apply where the temperature extremes were not so great.

Hence, the patentee, after prescribing the use of a gas inert to carbon dioxide, with a critical temperature below −80.5° F., specified that you should use a combined charge that would have less pressure at 140° F. than a normal charge of carbon dioxide at 140° F., and yet enough to exert a pressure of at least 200 pounds per square inch at −60° F.

In the specifications the patentee set forth 17 examples in which he listed the number of pounds of carbon dioxide in the chamber, the pressure of the nitrogen to be injected, the ratio of the nitrogen to the carbon dioxide by weight and the gauge pressure of the resultant charge at varying temperatures. By following the instruction of the claims and by the use of this table, the amount of nitrogen to be injected could be determined in accordance with the situation to be encountered.

■ 3. Defendant says plaintiff's patent was anticipated by the prior art. Defendant had been trying zealously to find a means of eliminating clogging at extremely low temperatures without success. It had employed the most skilled scientists to do so. This would have been unnecessary if the prior art supplied the answer.

There is no doubt that the prior art teaches the use of carbon dioxide and nitrogen to expel a fire extinguishing medium, or to form a protective covering. The Daney patent, issued in 1913 (finding 22) and the Muchka patent issued in 1922 (finding 23) are illustrative of this practice. Furthermore, the Levy, Phillips & Pain, and Odell references teach the use of nitrogen as an expellant for gases or liquids having such low vapor pressures at low temperatures that they are unable to expel themselves from their containers. However, none of these were concerned with the problem of clogging of the outlet passage at low temperatures, which was solved by Mapes, nor do they teach its solution.

The Hasche patent (finding 19) was for a method of making dry ice. Hasche used the pressure of nitrogen gas to force refrigerated carbon dioxide from its container. Hasche's object was to produce dry ice; in the instant patent, the object was to prevent the production of solid dry ice within the discharge passage. The solution of a stoppage or clogging problem was not attempted by

Hasche, and, as we have pointed out, in theory, the addition of nitrogen to liquid carbon dioxide would be expected to produce more solid carbon dioxide; a result beneficial to Hasche, but not to Mapes.

The Daney patent disclosed a fire extinguishing medium with a two-fold purpose. The first was to smother the blaze; the second to coat the combustible material with a chemical compound to prevent re-ignition. One of its primary uses was said to be combating forest fires. Carbon dioxide and nitrogen contained in a storage tank were used to expel water and the chemicals upon the fire. Defendant contends that this use of carbon dioxide and nitrogen in a separate container anticipates the patent in suit since it could be separately used as an extinguisher. However, Daney was not concerned with the problem of preventing the formation of dry ice in the discharge passage. The Daney patent in no way teaches the solution of the problem solved by Mapes and does not anticipate the patent in suit.

The teachings of the numerous patents and publications urged by the defendant are specifically set out in our findings and need not be repeated in this opinion. None of them anticipate the patent in suit.

■ 4. Plaintiff also claims a patent on a method of providing a continuous discharge of liquid carbon dioxide at very low temperatures. This method consists of forming, at normal temperatures, a charge in the container capable of exerting a pressure of about 200 pounds per square inch at −60° F., but whose weight is less than the weight of a normal charge of carbon dioxide, the charge consisting of carbon dioxide and some gas inert to carbon dioxide, whose critical temperature is below −80.5° F. The container may be charged either by injecting the carbon dioxide first or the nitrogen or other gas first.

The first four claims specify that the weight of the charge must be less than the weight of a normal charge of carbon dioxide.

Claim 6 teaches the formation of a charge by the injection of compressed gas sufficient to exert a pressure of 200 pounds at −60° F., and then filling the container with carbon dioxide to between 50 per cent and 95 per cent of its normal filling capacity.

Claim 7 is on a method of providing for a continuous discharge of carbon dioxide at −60° F. by the injection of sufficient gas, inert to carbon dioxide, to produce a pressure of from 200 to 500 pounds at −70° F. and filling the container with carbon dioxide to from 50 per cent to 95 per cent of its normal filling capacity. The gas to be used must be capable of exerting a pressure, coacting with carbon dioxide, to produce a pressure of 200 pounds per square inch at −60° F.

The Patent Office issued a patent on each of the method claims. No satisfactory reason has been assigned for us to hold that this action was incorrect.

■ 5. The trial commissioner set forth in findings 38 to 40 the methods and charges used by the Air Force. In finding 42 he sets forth his conclusions as follows:

"42. The first method of charging set forth in finding 38, responds in terms and in spirit to the recital of method claims 1, 2, 4, 6 and 7 in suit. The second method of charging, as set forth in finding 39, in which the nitrogen is added to carbon dioxide already in the cylinder, responds in terms and in spirit to the recital of method claim 3 in suit. The charge set forth in finding 40 responds in terms and in spirit to the recital of claims 8, 9, and 10 in suit. The several claims in suit cover methods and charges admittedly used by the defendant."

There can be no doubt of the correctness of his conclusions. Claims 1, 2, 3, 4, 6, 7, 8, 9 and 10 of Mapes' patent are valid and have been infringed by defendant and judgment will be entered to that effect.

The amount of reasonable and entire compensation to which plaintiff is entitled will be determined in further proceedings before a trial commissioner.

It is so ordered.

JONES, Chief Judge, REED, Justice (Retired), sitting by designation and MADDEN and LITTLETON, Judges, concur.